# DUNDALK HOLDING COMPANY, INC.
## *v.* HORN ET AL.

[No. 362, September Term, 1971.]

*Decided July 5, 1972.*

*Motion for rehearing filed August 3, 1972; denied September 11, 1972.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ., and RALPH W. POWERS, Chief Judge of the Seventh Judicial Circuit, specially assigned.

*Melvin A. Steinberg,* with whom were *Eleanor J. Lipsitz* and *Aaron Kadish* on the brief, for appellant.

*Eugene P. Smith,* with whom were *M. William Adelson, Donald N. Rothman* and *Andrew E. Adelson* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The two questions presented to us in this zoning appeal are whether the Circuit Court for Baltimore County (Turnbull, J.) erred in passing its order of November

17, 1971, reversing the decision of the County Board of Appeals of Baltimore County (County Board) for alleged lack of any substantial evidence to support its decision of April. 23, 1971, to grant the appellant, Dundalk Holding Company, Inc. (Dundalk), (a) a special exception for a theatre on its land in a B.L. (Business Local) zone and (b) a special permit for off-street parking on its adjoining land in a D.R. 5.5 (Residential) zone. We have concluded that there was sufficient evidence to support the County Board's decision and we will reverse the order of the lower court.

The subject property is located in the Third Election District of Baltimore County on the west side of Reisterstown Road approximately 100 feet south of Sudbrook Lane in the Pikesville business area and is known as 1110 Reisterstown Road. The portion of the subject property in the B.L. zone is rectangular in shape and has a frontage on the west side of Reisterstown Road of 64.33 feet with a depth of 142 feet, and contains .21 acre of land. Immediately adjoining that portion of the property to the west is an "L" shaped part of the land containing .376 acre zoned D.R. 5.5 for which the special permit for off-street parking was requested. The portion of the subject property fronting on Reisterstown Road is improved by a one-story masonry store building which Dundalk proposes to convert into a 300 seat mini-theatre operation, using the D.R. 5.5 parcel as a parking lot. The mini-type theatre operation will have a single entrance but will have two theatres of 150 seats each for the exhibition of motion pictures. The land to the west of the subject property is improved with commercial structures— stores and offices. To the east, the land is improved with a library and with an automobile service station. In front of the subject property, Reisterstown Road is 40 feet wide. The plat for the proposed improvement was approved by George E. Gavrelis, Director of the Office of Planning and Zoning of Baltimore County. The Deputy Zoning Commissioner of Baltimore County on December 8, 1970, granted the requested special exception and

granted a special hearing for the requested parking permit.

The appellees, Robert Horn and Julia Horn, his wife, Whittier Realty Corporation, Pikesville Pharmacy, Inc., Sterling Amusement Corporation and J. F. Theatres, Inc., being landowners in the immediate area, appealed the decision of the Deputy Zoning Commissioner to the County Board, which, after a hearing, granted the special exception and special parking permit on April 23, 1971. Thereafter, the appellees perfected an appeal to the lower court, which, as we have stated, on November 17, 1971, reversed the order of the County Board. Dundalk perfected a timely appeal to this Court from the order of November 17.

There is no dispute between the parties in regard to the applicable law. If the action by the County Board was supported by any substantial evidence, then the matter before it was "fairly debatable" and the lower court should not substitute its judgment for that of the administrative body; on the other hand, if the action of the County Board was not supported by any substantial evidence, then its action was arbitrary and capricious and a denial of due process of law as prohibited by Art. 23 of the Declaration of Rights of the Maryland Constitution and should have been reversed by the lower court for this reason.

As we stated in *Prince George's County v. Meininger*, 264 Md. 148, 152, 285 A. 2d 649, 651 (1972):

> "For the lower court to have been correct in its holding it would have had to have found, and the record would have had to have shown, 'that the action of the District Council was unsupported by competent, material and substantial evidence and therefore, was arbitrary and capricious.' "

The determination of the present appeal, therefore, turns upon a consideration of the facts presented to the County Board. As we have indicated, we are of the opin-

ion that there was sufficient substantial evidence presented before that Board to make its decision fairly debatable.

### (1)

By Section 502.1 of the Baltimore County Zoning Ordinance, it is provided that for the County Board to grant a special exception it must be shown that the proposed use will not:

> "a. Be detrimental to the health, safety, or general welfare of the locality involved;
>
> "b. Tend to create congestion in roads, streets or alleys therein;
>
> "c. Create a potential hazard from fire, panic or other dangers;
>
> "d. Tend to overcrowd land and cause undue concentration of population;
>
> "e. Interfere with adequate provisions for schools, parks, water, sewerage, transportation or other public requirements, conveniences, or improvements;
>
> "f. Interfere with adequate light and air."

Dundalk produced as its first witness before the County Board its Vice-President, Howard A. Wagonheim, who had resided in Pikesville for some 12 years, approximately one mile from the subject property. He was familiar with "the entire Pikesville area community and the whole commercial strip along Reisterstown Road." He buys all the films for Dundalk and other motion picture corporations and has managed, supervised and operated those corporations for almost 24 years. The other motion picture corporations include:

> ". . . the Homewood Amusement Company, which operates the Playhouse at 25th and Charles; the Five West Amusement Company, which operates the Seven East and the Five West at North and Charles; the Paramount Amusement Company, which operates the Para-

mount Theatre at 6650 Belair Road; and similar corporations of Maryland which operate Cinema 1 and Cinema 2 in the Yorkridge Shopping Center in Lutherville and Timonium."

After describing the subject property, its improvements and the surrounding commercial area, Mr. Wagonheim stated why he had selected the subject property for the proposed theatre operation, as follows:

"Several reasons: the building is available, it is on commercial property, with a parking lot which more than meets the minimum zoning requirements for what I propose to do at this site, and for which we have been granted permission to do by the Deputy Zoning Commissioner.

"The minimum requirements for parking are 1 space for every 6 seats. I intend to construct what is called a mini-theatre, with a total of 300 seats. There will be 2 auditoriums of 150 seats each, which is a very small theatre. We have 60 parking spaces, which is actually 1 parking space for every 5 seats."

* * *

"A. It more than meets the [minimum] county requirements. The minimum requirements are 1 space for every 6 seats, which in fact would mean that at this location, with the number of parking spaces that we have, we could actually put in 360 seats, or a total of 360 seats, or 180 seats in each auditorium.

"I have done research on population within a 2-mile radius of this site, with the use of census tracts. Coupled with the census-tract population figures that I have, which indicate that within a 2-mile radius of this site the population has grown from 39,730 as of January 1, 1960, to 65,479 persons as of January 1, 1970.

"Pikesville has only one existing theatre, which, over the last 193 weeks, which is 3 years and 37 weeks, has had 47 programs, which is an average of one program every 4.11 weeks, and it is my feeling, with my background, in developing other theatres in areas which are very much similar to Pikesville, Pikesville residents deserve and should have another theatre."

In regard to the proposed hours of operation, Mr. Wagonheim stated:

"The very earliest we would operate our box office would be at one-thirty in the afternoon, and with these miniature auditoriums I would operate this on a staggering schedule basis, which means that on one side we would program our features at one-thirty, three-thirty, five-thirty, seven-thirty, and nine-thirty, and on the other side at two, four, six, eight, ten, so that the last feature would go on at ten o'clock at night."

He further stated that he was aware that there was existing in the Pikesville area "a void of sufficient parking spaces for many of the merchants" and that when the proposed parking spaces were not used for the proposed theatre operation, he would allow them to use the spaces.

In regard to the likely hours for most patrons to use the proposed theatre, Mr. Wagonheim testified that from his experience in the operation of other theatres, they would be as follows:

"Predominantly the usage of this theatre will be after seven o'clock, from Monday through Saturday, and all day Sundays. I have research patterns at Cinema 1 and Cinema 2, which is a twin operation.

"* * * [These are located at] Yorkridge Shopping Center in Lutherville. The Paramount,

which is operated in the 6600 Block of Belair Road, I went through the year of 1969 on an admission basis, day by day, and the average, well I will give it to you exactly: In 1969, Cinema 1 had a total attendance of 71,983 people. Of that 71,983 people, 57,765 purchased tickets after seven o'clock, from Monday through Saturdays and all day on Sundays, which was actually figures to figure up 80.24%, that is average.

"I did the same thing with Cinema 2. Our total attendance at Cinema 2 was 113,490 people. Of that 113,490 people, 97,465 purchased tickets after seven, from Monday through Saturday nights and all day Sundays, which was 85.88% of our total attendance.

"I wanted to check still further and corroborate these findings, so I went to the Paramount Theatre for the year 1969. The Paramount total attendance was 48,993. Of the 48,-993,—36,950 tickets were sold after 7:00 p.m. from Monday through Saturday nights and all day Sunday, which was 75.42% of our total attendance.

"There is no doubt that in a suburban area, such as exists in Pikesville, that the same pattern would prevail. I could even take figures further, take it back to six o'clock, and show that the percentages from six o'clock from Monday through Saturday nights and all day Sundays, are even higher."

Mr. Wagonheim testified further that he was familiar with the Baltimore County Zoning Regulations and specifically Section 502.1 and was examined and testified as follows:

"Q. As a result of your experience as a motion-picture exhibitor, and in the varied neighborhoods and suburban shopping centers, do

you feel that the granting of a special exception to locate a motion picture theatre on the subject site would be detrimental to the health, safety, and welfare of the locality? A. Absolutely not."

\* \* \*

"Q. From your experience, it will not be detrimental to the general welfare? A. From my experience, yes it will not.

"Q. Will it tend to create congestion in the roads, streets, and alleys? A. No.

"Q. Have you hired an expert to analyze the traffic situation in the area? A. Yes, I have.

"Q. Will it tend to create a potential hazard from fire, panic, or other dangers? A. From my experience, no.

"Q. Will it tend to overcrowd land and cause undue concentration of population? A. No.

"Q. Of course, I think you know that the property is presently zoned B-L, and any number of commercial uses can be placed on the subject property, is that correct? A. That is right.

"Q. Will this interfere with adequate provisions for schools, parks, water, sewerage, transportation, or other public requirements, conveniences, or improvements? A. No.

"Q. Will it interfere with adequate light and air? A. It will not.

"Q. Certainly, sir, if the Board were to deny you this request for a special exception, you would put the property to a commercial use, would you not? A. Yes, we would put it to a commercial use. We would lease it, and in competition to at least some of the existing retail merchants in the Pikesville area, which would generate and add to the existing traffic conditions during the hours with which they operate.

"Q. As a matter of fact, you could put even a drug store or a grocery store or small depart-

"ment store or a liquor store, automobile parking lot, or accessory supply shop, a barber shop or beauty shop, or any type of business, such as the other properties, as it is already zoned, can't you? A. Right."

Except upon the issue of traffic conditions in the locality, Mr. Wagonheim's testimony was substantially uncontradicted and, in our opinion, supplied more than a scintilla of evidence to support the finding by the County Board that the criteria set forth in Section 502.1 had been sufficiently established by the applicant. The County Board obviously accepted Mr. Wagonheim's testimony and opinions in regard to the criteria. In our opinion, Mr. Wagonheim's substantial experience in the management, supervision and operation of theatres—already set forth—is sufficient to permit the County Board to consider him as an expert in this field and to conclude that his testimony and opinions in regard to the criteria established by Section 502.1 were sufficient to support the County Board's conclusion that the criteria had been met. *See Air Lift, Ltd. v. Board of County Commissioners of Worcester County*, 262 Md. 368, 278 A. 2d 244 (1971); *Mondawmin Corp. v. Kres*, 258 Md. 307, 266 A. 2d 8 (1970); 2 Am. Jur. *Administrative Law* § 422, at 232.

It should be kept in mind, also, that the Deputy Zoning Commissioner had determined that "the prerequisites of Section 502.1 of the Baltimore County Zoning Regulations [had] . . . been met" in his order of December 8, 1970, granting the special exception and the special parking permit, incorporating in his order the map of August 18, 1970, as revised, which was approved by George E. Gavrelis, Director of the Office of Planning and Zoning for Baltimore County. Admittedly, the Deputy Zoning Commissioner and the Director of the Office of Planning and Zoning are experts in this field and their respective findings and approval were before the County Board. *See Stephens v. Montgomery County Council*, 248 Md. 256, 259, 235 A. 2d 701, 703 (1967). *See also Malasky v. Montgomery County*, 258 Md. 612, 624-25, 267 A. 2d 182,

189-90 (1970) and *Board of County Commissioners of Howard County v. Turf Valley Associates*, 247 Md. 556, 562, 233 A. 2d 753, 756-57 (1967).

The appellees refer to the rule that "an expert's opinion is of no greater probative value than the soundness of his reasons given therefor will warrant," *Miller v. Abrahams*, 239 Md. 263, 273, 211 A. 2d 309, 314 (1965). *See also Surkovich v. Doub*, 258 Md. 263, 272, 265 A. 2d 447, 451 (1970); *Westview Park v. Hayes*, 256 Md. 575, 581-82, 261 A. 2d 164, 167-68 (1970); and *County Commissioners for Prince George's County v. Luria*, 249 Md. 1, 3, 4, 238 A. 2d 108, 109-10 (1967). They contend that the rule applies to Mr. Wagonheim's testimony. We do not agree with this contention. Mr. Wagonheim, as we have observed, testified rather fully in regard to (a) the surrounding properties and general commercial area surrounding the subject property, (b) his familiarity with the area over the past 12 years during which he lived approximately one mile from the subject property, (c) the essential details of the proposal and how it would be implemented practically and (d) his quite substantial experience over a 24-year period with the management, supervision and operation of a number of theatres in the general Baltimore area. As we have observed, this experience and his long personal knowledge of the neighborhood involved give his opinions in regard to the criteria *some* probative force and amount to more than a mere "scintilla" of evidence. The *weight* of this evidence was for the County Board. Mr. Wagonheim's opinions *might* have been impaired by cross-examination or possibly by the use of the testimony of others; but, as we have stated, his testimony was substantially uncontradicted and unimpaired. In our opinion, the rule mentioned in *Miller, Surkovich, Westview Park* and *Luria* is not applicable in the present case.

The principal issue before the County Board and the lower court was in regard to an alleged traffic hazard which would result if the application would be granted. In regard to this issue, the parties produced well-qualified

traffic engineers. Dundalk produced William E. Corgill, a registered traffic engineer who held a Bachelor of Science Degree in civil engineering from Bucknell University, was a graduate from the Bureau of Highway Traffic Graduate School at Yale University, and who would shortly receive his Ph. D. in Transportation at Catholic University. He had also spent two years as a civil engineer in the New York State Department of Public Works and had been traffic engineer on the staff of the Association of Casualty and Surety Companies—a trade association of stock casualty and insurance business in New York. He was also staff director for traffic safety in Washington, D. C. for eight years. He is also a member of several professional institutes connected with engineering and traffic safety.

Mr. Corgill was of the opinion that the proposed theatre would generate less traffic than any other business usage of the subject property and that traffic generated by the proposed theatre would be at times when normal traffic would be at a minimum, between Monday through Saturday after 7:00 p.m. and on Sunday. He pointed out that, in his opinion, the traffic coming to the theatre would be spread over a comparatively broad period of time while departing traffic would dissipate in a relatively short period of time. His conclusion was that the granting of the application would not result in a traffic hazard.

The appellees, on the other hand, produced an equally well-qualified traffic expert in Dr. Walter Worthington Ewell, who came to a conclusion different from that of Dundalk's expert, Corgill. Dr. Ewell holds the degrees of B.E. in civil engineering and Dr. Eng. from The Johns Hopkins University and was an instructor and Assistant Professor at that University, having taught highway engineering, structural engineering and other courses in the civil engineering department. He has been a consultant to the Baltimore City Department of Planning on highway and interchange problems. He, too, is a member of a number of professional engineering societies.

In Dr. Ewell's opinion, *inter alia,* unless a second exit from the parking lot were provided, there would be a traffic hazard on Sudbrook Lane west of Reisterstown Road when the patrons of the proposed theatre were attempting to arrive or depart during relatively short periods of time near the beginning of the feature film.

It is apparent to us that in view of the differing opinions of the two well-qualified experts, the traffic hazard issue was "fairly debatable" and the County Board could quite properly accept the opinion of the expert of Dundalk rather than that of the appellees. As we have already stated, the Courts, under these circumstances, should not substitute their judgment on a fairly debatable issue for that of the administrative body.

The appellees contend that the County Board failed to comply with the requirement of Section 501.4 of the Baltimore County Zoning Ordinance requiring the Board to include in its opinion "a statement of the facts found and the grounds for its decision."

The County Board in its opinion described the subject property and its improvements as well as the proposal set forth in the application. It pointed out that the "primary protestants were the operator of the nearby Pikes Theatre and a Pikesville businessman who depends heavily upon the use of the Pikes Theatre parking lot to accommodate his customers." The Board considered the "key question" to be the traffic to be generated by the proposal and its impact upon the area. It noted that each side presented well-qualified experts who offered their respective opinions on the subject. It stated its reasons why it was more impressed with the opinions of Dundalk's expert than with those of the expert for the appellees. It then stated:

> "Without further detailing the evidence and testimony, it is the judgment of the Board that the Petitioner has satisfied the elements in Section 502.1 of the Baltimore County Zoning Regulations, and the special exception and permit as requested should be granted."

In our opinion, the opinion of the County Board, taken as a whole, complied with the requirement of Section 501.4.

### (2)

The appellees earnestly contend that there was insufficient evidence to support the granting of the special permit for off-street parking in the residential zone. We are of the opinion that there was such sufficient evidence.

The County Board, in its opinion, observed that Dundalk's vice-president had testified that the proposed parking lot would be available to Pikesville businesses when not used by the proposed theatre. It stated: "Hence, the Board foresees the opportunity to provide a good service to the surrounding business community by adding sorely needed parking spaces, exactly as the primary protestant does for the business near his theatre." In short, the County Board concluded that the proposed parking area was needed, not only for the proposed theatre operation, but for partial relief of the parking problem for the surrounding business community.

The criteria set forth in Section 409.4—Business or Industrial Parking in Residence Zones—were met by the findings and conditions appearing on the plat approved by the Director of the Office of Planning and Zoning, already mentioned, upon which the application was granted. These conditions were as follows:

"A. Land adjoins the business involved.

B. Only passenger vehicles, excluding busses, will use the parking area.

C. No loading, service, or any use other than parking shall be permitted.

D. Lighting shall be regulated as to location, direction, hours of illumination, glare & intensity, as required.

E. Screening by a wall, fence, planting & or otherwise shall be required as deemed advisable by the office of planning.

F. A paved surface, properly drained, shall be provided.

G. A satisfactory plan, showing parking arrangement & vehicular access shall be provided.

H. Method & Area of operation, provision for maintenance & permitted hours of use shall be specified & regulated as required. Hours of use to support operation of theatre only. Between 12 Noon & 12 PM."

In addition, a typical light standard eight feet high is sketched on the plat with the notation:

"Note: Deflectors shall be adjusted to prohibit light to residential areas."

These findings and conditions together with the testimony of Mr. Wagonheim and Mr. Corgill are, in our opinion, sufficient to support the grant by the County Board of the special parking permit for off-street parking in the residential zone.

*Order of November 17, 1971, of the Circuit Court for Baltimore County reversing the order of the County Board of Appeals for Baltimore County of April 23, 1971, reversed and the order of the County Board of April 23, 1971, granting the application for a special exception and a special parking permit in a residential zone, be reinstated; the costs to be paid by the appellees.*